**Cedric MCNEIL, Appellant**

v.

**COMMONWEALTH of Kentucky, Appellee**

2014–SC–000163–MR

Supreme Court of Kentucky.

RENDERED: AUGUST 20, 2015

Daniel T. Goyette, Louisville Metro Public Defender, Bruce P. Hackett Chief Appellate Public Defender, Joshua Michael Reho, Assistant Appellate Public Defender, for Appellant.

Jack Conway, Attorney General of Kentucky, Leilani K.M. Martin, Assistant Attorney General, for Appellee.

OPINION OF THE COURT BY JUSTICE ABRAMSON

Cedric McNeil appeals as of right from a Judgment of the Jefferson Circuit Court convicting him of first-degree robbery, Kentucky Revised Statute (KRS) 515.020, and first-degree assault, KRS 508.010. In accord with the jury's recommendations,

the trial court sentenced McNeil to consecutive maximum terms of ten years for the former and eighteen years for the latter offense. McNeil was accused of stealing a purse from an acquaintance, Donna Wheeler, and of furthering the theft by running over Wheeler's friend, Candra Rose, with a car. At trial, McNeil argued that this was a case of mistaken identity, the two women having incorrectly picked out his photograph from a photo array shown to them by the police. On appeal, McNeil contends that the jury instructions with respect to both offenses were flawed, that his sentences for both assault and robbery in effect punish him twice for a single offense in contravention of constitutional and statutory provisions against double jeopardy, and that his trial was rendered unfair when a police officer was permitted to refer to an unauthenticated phone company record in violation of the rule against hearsay. Convinced that there was no reversible error, we affirm.

### RELEVANT FACTS

At McNeil's January 2014 trial, Wheeler testified that in mid-November 2012 she received several hundred dollars in settlement of a law suit and that she used some of the settlement proceeds to reserve a week's lodging for herself and Rose at the Louisville Manor Inn on Dixie Highway in the Shively area of south Louisville. A couple of days before, she and Rose had struck up an acquaintanceship with a man who introduced himself as "B," and in the interim Wheeler had used Rose's phone to exchange a number of text messages with her new acquaintance. Wheeler testified that one of the first things she did upon taking up residence at the hotel was to invite "B" to come visit.

According to Wheeler, "B" arrived that first evening while Rose was in the shower. Wheeler left the room briefly to buy drinks from a vending machine, and when she left the room, she testified, her purse was on the bed. Soon after Wheeler returned from the vending machines, Rose emerged from the bathroom, and Rose testified that as she came into the main room she saw "B" leaving the room with one of his hands held inside the front of his jacket, as though he was concealing something there. She called out to "B" to wait for a minute; exclaimed to Wheeler, "He's got your purse;" and when "B" began to run, ran after him out of the room and down the stairs. Both women chased "B" to the parking lot where he locked himself in his car.

Wheeler testified that she pounded on the driver's window demanding that "B" give back the purse, and Rose testified that she stood in front of the car and looked directly into "B's" eyes. He told her to move; she told him to surrender the purse. Rose testified that "B" drove slowly forward and forced her to back up a few steps, but that when she continued to block his path and to look into his eyes he suddenly accelerated and knocked her down. She testified that she became lodged beneath the car, was dragged for several feet, and was only "spit out" when "B" finally stopped, backed up a bit, and drove forward again with enough momentum to get over a speed bump.

The trauma doctor who treated Rose testified that in addition to severe abrasions on her back and arms, Rose suffered multiple broken ribs, a collapsed lung, an injured kidney, and a spleen so badly injured that it had to be removed so as to stop the internal bleeding. Rose testified that she spent thirteen days in the hospital as a result of her injuries, and that in January 2014, some fourteen months after the incident, she still suffered pain in her ribs and that occasionally she lost both feeling and function in her right arm and hand.

The incident was witnessed by another person who was pulling into the parking lot at the time, and it was recorded by three hotel security cameras. The witness described and the videos depicted a driver every bit as callous as the person Wheeler and Rose claimed stole Wheeler's purse, but neither the witness nor videos could give the jury more than a very general idea of what the driver looked like.

To prove that the driver was McNeil, the Commonwealth presented testimony by its investigators to the effect that one of the phone numbers Wheeler used to contact "B" turned out to be a Cricket company number, which, upon inquiry at a local Cricket outlet, was found to be registered to McNeil. Having made that discovery, the officers prepared a "photo pack,"—an array of six photos, McNeil's and five others similar to his—which the officers then showed, separately, to Wheeler and to Rose. Both women picked out McNeil's photo from the array as very likely the person who had robbed them, and both women testified at trial that the defendant in the courtroom, McNeil, was that person to a virtual certainty. McNeil did not testify, but through cross-examination and argument he attempted to cast doubt on those identifications.

On appeal, McNeil complains primarily about what he asserts were flaws in the jury instructions. The first-degree assault instruction, he maintains, omitted one of the elements of the crime, and the first-degree robbery instruction deprived him of his right to a unanimous verdict. We begin our discussion with these assertions of instructional error.

### ANALYSIS

### I. The Assault Instruction's Omission of a Finding That the Car Was a Dangerous Instrument Was Harmless.

■ KRS 508.010 provides that

[a] person is guilty of assault in the first degree when

(a) He intentionally causes serious physical injury to another person by means of a deadly weapon or a dangerous instrument; or

(b) Under circumstances manifesting extreme indifference to the value of human life he wantonly engages in conduct which creates a grave risk of death to another and thereby causes serious physical injury to another person.

KRS 500.080(3) defines "dangerous instrument" as "any instrument, including parts of the human body when a serious physical injury is a direct result of the use of that part of the human body, article, or substance which, under the circumstances in which it is used, attempted to be used, or threatened to be used, is readily capable of causing death or serious physical injury."

The first-degree assault instruction in this case directed the jury to

find the defendant, CEDRIC MCNEIL, guilty of Assault in the First Degree . . . if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:

A. That in Jefferson County, on or about November 17, 2012, he caused a serious physical injury to Candra Rose by hitting her with a car; AND

B. That in so doing:

(1) The defendant intended to cause serious physical injury;

OR

(2) that he did so under circumstances manifesting an extreme indifference to the value of human life when he wantonly engaged in conduct which created a grave risk of death to

Candra Rose and thereby caused her serious physical injury.

An essential element of one of the Commonwealth's theories of the assault was that McNeil intentionally caused a serious physical injury to Rose by means of a dangerous instrument, KRS 508.010(a). The dangerous instrument element requires the jury to find both that the defendant made use of the object in question—here McNeil's car—and that the object was a "dangerous instrument" as defined in KRS 500.080(3). Although the instructions included an appropriate definition of "dangerous instrument," they did not, as McNeil notes,[1] require the jury to find that the car with which McNeil hit Rose was a "dangerous instrument" as so defined.[2]

■ We have held in a number of cases, where the jury is similarly required to find both that the defendant used a particular object to commit the offense and that the object meets the statutory definition of "deadly weapon" or "dangerous instrument," that the failure to have the jury apply the statutory definition to the injury-causing object at issue is an error, but an error that is harmless if a properly instructed jury would clearly and beyond a reasonable doubt have made the additional finding. *Wright v. Commonwealth,* 239 S.W.3d 63, 68 (Ky.2007) ("[I]t is beyond question that the jury would have found the pistol carried by Appellant to be a deadly weapon."); *Thacker v. Commonwealth,* 194 S.W.3d 287, 291 (Ky.2006) ("[T]here is little doubt that the jury would have found a .22–caliber revolver to be a deadly weapon."); *Meece v. Commonwealth,* 348 S.W.3d 627, 718 (Ky.2011) (Properly instructed jury would have found pistol a "deadly weapon."). *See Neder v. United States,* 527 U.S. 1, 18, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (holding that an omitted-element error may be deemed harmless if it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error."); *see also Mullikan v. Commonwealth,* 341 S.W.3d 99, 106 (Ky. 2011) (noting that if clear beyond a reason-

1. McNeil tendered an appropriate first-degree assault instruction which the trial court declined to discuss but expressly acknowledged was adequate to preserve McNeil's objection to the court's use of an alternative instruction.

2. The Commonwealth argues that because the robbery instruction included an option whereby the jury could find McNeil guilty of that offense if it believed, among other things, that he "was armed with a dangerous instrument as defined in Instruction No. 3," that instruction and McNeil's robbery conviction can be relied upon as an implicit "the car was a dangerous instrument" finding with respect to the assault. As McNeil points out, however, the jury's robbery verdict need not have been based on the "dangerous instrument" option, and so would not support the Commonwealth's inference even if its argument did not otherwise encourage complicated instructions when the goal should be simple ones. Here, for example, the assault instruction could simply have followed the model instruction at 1 Cooper, *Kentucky Instructions to Juries (Criminal)* § 3.36 (5th ed. 2014), and provided as follows:

You will find the defendant, CEDRIC MCNEIL, guilty of Assault in the First Degree ... if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:

A. That in Jefferson County, on or about November 17, 2012, he caused a serious physical injury to Candra Rose by hitting her with a car; AND.

B. That in so doing:

(1)(a) The Defendant intended to cause serious physical injury to Candra Rose, AND

(b) The car was a dangerous instrument as defined under instruction No. 3; OR

(2) The Defendant was wantonly engaging in conduct which created a grave risk of death to another and thereby injured Candra Rose under circumstances manifesting extreme indifference to the value of human life.

able doubt that the error did not affect the verdict, omitted-element error may be deemed harmless "despite our presumption that erroneous jury instructions are prejudicial").

Similarly here, there is no reasonable doubt that had the jury been asked, as it should have been, whether McNeil's car was a "dangerous instrument" when he used it to run down Candra Rose in the course of stealing Wheeler's purse, it would have found that it was a "dangerous instrument" and thus would still have found, as it did, that McNeil was guilty of first-degree assault. So the trial court erred by leaving out of the assault instruction a finding that the car was a dangerous instrument under these circumstances, but the error in this case was harmless beyond a reasonable doubt and thus does not entitle McNeil to relief.

## II. A Unpreserved Misstatement of Law in the Robbery Instruction Did Not Result in Manifest Injustice.

■ McNeil also takes issue with the first-degree robbery instruction, an instruction he contends deprived him of his right to a unanimous verdict. First-degree robbery is addressed in KRS 515.020, which provides for three modes of the offense:

A person is guilty of robbery in the first degree when, in the course of committing theft, he uses or threatens the immediate use of physical force upon another person with intent to accomplish the theft and when he:

(a) Causes physical injury to any person who is not a participant in the crime; or

(b) Is armed with a deadly weapon; or

(c) Uses or threatens the immediate use of a dangerous instrument upon an person who is not a participant in the crime.

The trial court instructed the jury that it was to find McNeil guilty of robbery in the first degree

if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:

A. That in Jefferson County on or about November 17, 2012, the defendant stole or attempted to steal items from Candra Rose or Donna Wheeler; AND

B. That in the course of so doing and with intent to accomplish the theft, he used or threatened the immediate use of physical force upon Candra Rose; AND

C. That when he did so, he was armed with a dangerous instrument as defined in Instruction No. 3; OR

D. That when he did so, he caused physical injury to Candra Rose, who was not a participant in the crime.

McNeil concedes that he did not preserve the error he alleges by tendering a robbery instruction or by objecting to the court's instruction as a misstatement of the law. He maintains, however, that by offering the jury a theory of the case not provided for by the statute—using or threatening the immediate use of physical force while armed, not with a deadly weapon but with a dangerous instrument—the robbery instruction was palpably erroneous and rendered his robbery conviction manifestly unjust, the predicates to relief under Kentucky Rule of Criminal Procedure (RCr) 10.26. Although we agree with McNeil that the error here was palpable, we do not agree that it resulted in manifest injustice.

As noted, the General Assembly has made forcible theft from a person an aggravated offense if the perpetrator physically injures a nonparticipant in the crime, if he is armed with a deadly weapon, or if

he uses or threatens the immediate use of a dangerous instrument. It has not, however, singled out for enhanced punishment a robber's merely being armed with a dangerous instrument, as the instruction at issue provides. This makes good sense because people are commonly in possession of ordinary objects—belts, hammers, cars, for example—that could readily prove lethal if used in certain ways, but that are not dangerous instruments until so used. It makes little sense to say that one is "armed" with such an object, since the "arming" could only become apparent after the fact of misuse. Be that as it may, "armed with a dangerous instrument" is clearly not one of the modes of first-degree robbery and the trial court erred palpably by giving a jury instruction that said otherwise.

■ McNeil contends that the upshot of the trial court's error was a dual-theory robbery instruction one of the theories of which was invalid. Because that is how McNeil has framed the issue, we begin with our multiple-theory jurisprudence. As we have many times explained, a jury instruction can combine multiple theories of the same offense so long as there is sufficient evidence to support each theory. "This is because, no matter which theory they accepted, all the jurors convicted under a theory supported by the evidence and all the jurors convicted the defendant of the same offense." *Travis v. Commonwealth*, 327 S.W.3d 456, 460 (Ky.2010). If one of the theories is not supported by sufficient evidence, however, or if, as here, one of the theories does not accurately reflect the law of the offense, then a combination instruction implicates the defen-

dant's right under Section 7 of the Kentucky Constitution to a unanimous verdict, the concern being that the jury may not have been unanimous in basing its decision on a factually supported and legally accurate theory. *Commonwealth v. Goss*, 428 S.W.3d 619 (Ky.2014) (discussing both legally erroneous instruction and factually unsupported one).[3]

That concern is mitigated, however, if there is no reasonable possibility that the jury actually relied on the erroneous theory. In that case, we have held, " 'there is no unanimity problem,' " and the error, even if preserved, " 'is simply harmless because there is no reason to think the jury was misled.' " *Commonwealth v. Hasch*, 421 S.W.3d 349, 365 (Ky.2013) (quoting *Travis*, 327 S.W.3d at 463, and finding no reason to believe jury was misled by erroneously included "straight reckless homicide" instruction when victim was shot at point blank range). Where the issue has not been preserved and the palpable error standard, with the requirement of manifest injustice, applies, it is even less likely that this type of error will mandate reversal. That is the case here, and our conclusion is further strengthened by the fact that this is not a case in which an instructed upon alternative theory of the crime lacked evidentiary support, but one in which a factually supported theory was misstated, the trial court employing the wrong verb ("armed with" vs. "used") in attempting to state what would have been, with the right verb, a legally correct and factually supported "dangerous instrument" theory (KRS 515.020(c)) of the events at the Louisville Manor Inn.

3. The legally erroneous theory in *Goss* was a theft of identity charge based on fraudulent use of credit cards. KRS 514.160(4) states expressly that the identity theft statute does not encompass credit or debit card fraud, rendering the charge against Goss legally er-

roneous to the extent it was based on fraudulently obtaining and using a credit card. As discussed *infra*, the dangerous instrument theory of robbery is legally and factually correct in this case but the instruction misstated the elements.

The robbery instruction correctly directed the jury to find McNeil guilty of that offense if it believed that he injured Rose in the course of forcibly stealing Wheeler's purse, *i.e.,* a KRS 515.020(a) offense. Assuming that McNeil was the robber, as the jury obviously believed he was, the evidence that he did so injure Rose was overwhelming and undisputed. Given that the evidence and law also supported a KRS 515.020(c) version of the offense, the issue is whether there is any reasonable possibility that any of the jurors was misled by the instruction that incorrectly allowed McNeil to be found guilty of robbery if, in the course of the theft, he "was armed with," as opposed to having "use[d]" (KRS 515.020(c)), a dangerous instrument. It is unlikely that the erroneous verb was misleading because the very definition of "dangerous instrument," which the jury instructions included, refers to "any instrument ... which, under the circumstances in which it is used, attempted to be used, or threatened to be used, is readily capable of causing death or serious physical injury." Thus, the concept of use or threatened use is part of any finding that a dangerous instrument was involved. But even if reasonable minds might differ on the issue, there is no reasonable basis for finding that the erroneous verb resulted in manifest injustice. The evidence, testified to by three people and recorded in appalling detail by the security cameras, made it plain that McNeil was not simply "armed with" a car, but he "used" it as a dangerous instrument in the furtherance of a theft, one indisputably involving physical injury. The error, palpable though it was, did not render McNeil's robbery conviction manifestly unjust and does not entitle McNeil to relief.

### III. McNeil Has Not Been Punished Twice For the Same Offense.

■ McNeil next contends that his assault of Rose was part and parcel of the robbery, so that punishing him under both statutes amounts to punishing him twice for the same offense in contravention of his right not to be subjected to double jeopardy. Although unpreserved, this issue, McNeil correctly notes, is one we regularly review notwithstanding the lack of preservation. *See Terry v. Commonwealth,* 253 S.W.3d 466, 470 (Ky.2007) ("[U]nder our longstanding rule, double jeopardy questions may be reviewed on appeal, even if they were not presented to the trial court.").

■ The Double Jeopardy Clauses of the Fifth Amendment to the United States Constitution and Section 13 of the Kentucky Constitution both guarantee that no person shall, "for the same offense," be "twice put in jeopardy of life or limb." The federal provision applies to the states through the Fourteenth Amendment. *Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). And we have held that the Kentucky double jeopardy provision is "identical in [its] import" with its federal counterpart. *Jordan v. Commonwealth,* 703 S.W.2d 870, 872 (Ky. 1985). Generally, the prohibition against double jeopardy shields a defendant from a second prosecution for the same offense after either conviction or acquittal, but it also prohibits multiple punishments for the same offense. *Jordan,* 703 S.W.2d at 872 (*citing Ohio v. Johnson,* 467 U.S. 493, 104 S.Ct. 2536, 81 L.Ed.2d 425 (1984)).

■ With respect to multiple punishments, however, the effect of the double jeopardy clauses is limited, "do[ing] no more than prevent[ing] the sentencing court from prescribing greater punishment than the legislature intended." *Missouri v. Hunter,* 459 U.S. 359, 366, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983). If the legislature wants to impose multiple punishments for

the same offense, it may do so. *Garrett v. United States,* 471 U.S. 773, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985). A court's task, then, when determining the permissibility of imposing multiple punishments for a single transaction or course of conduct is simply to determine the legislature's intent. *Hunter,* 459 U.S. at 367, 103 S.Ct. 673 (*citing Albernaz v. United States,* 450 U.S. 333, 340, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981)).

■ Often enough, of course, when a defendant's acts violate more than one criminal provision, the implicated statutes will not make clear whether and to what extent multiple punishments are intended, and in that event the United States Supreme Court has developed a default rule, the so-called *Blockburger* test, for making that determination. Under that test,

> where the same act or transaction constitutes a violation of two (or more) distinct statutory provisions, the test to be applied to determine whether there are two (or more) offenses or only one, is whether each provision requires proof of a fact which the other does not.

*Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932). As this Court has recognized, however, if the General Assembly's intent is clear, that intent controls without resort to *Blockburger* analysis. *Lloyd v. Commonwealth,* 324 S.W.3d 384 (Ky.2010) (Notwithstanding distinction under *Blockburger,* The General Assembly clearly intends for theft by unlawful taking to merge with robbery.).

In KRS 505.020 the General Assembly has itself addressed rules of thumb regarding the question of multiple offenses arising from a single course of conduct. The general rule, the legislature has declared, is simple: "[w]hen a single course of conduct of a defendant may establish the commission of more than one (1) offense, he may be prosecuted for each such offense." However, the legislature has carved out exceptions to that general rule for "included" offenses, KRS 505.020(1)(a); for offenses requiring inconsistent findings of fact, KRS 505.020(1)(b); and for offenses designed to prohibit a continuing course of conduct where only an uninterrupted course of that conduct is alleged, KRS 505.020(1)(c). The statute incorporates the *Blockburger* test, we have held, as one of the ways to determine whether one offense is included in another, *Commonwealth v. Burge,* 947 S.W.2d 805 (Ky.1996) (referencing KRS 505.020(2)(a)). But the statute also deems offenses the "same" for double jeopardy purposes if one is an attempt to commit the other, KRS 505.020(2)(b), if one differs from the other only in requiring for its commission a lesser kind of culpability, KRS 505.020(2)(c), or if one differs from the other only in requiring for its commission a less serious injury or risk of injury to the same person, property, or public interest, KRS 505.020(2)(d). McNeil contends that his convictions for robbery and assault violate both KRS 505.020(1)(a) and KRS 505.020(*l*)(c) because in this case, at least, assault should be deemed included within robbery and because a continuing course of conduct has given rise to more than one offense. We reject McNeil's KRS 505.020(1)(c) claim out of hand,[4] and we also reject his merger

---

4. KRS 505.020(1)(c) applies only to charges that a defendant has committed more than once an offense "designed to prohibit a continuing course of conduct," offenses, that is, where "a course of conduct by a defendant endures over an extended period and continu- ously violates a single statutory provisions." Michelle A. Leslie, *State v. Grayson: Clouding the Already Murky Waters of Unit of Prosecution Analysis in Wisconsin,* 1993 Wis. L.Rev. 811, 812 n.4 (1993). The commentary to the Penal Code gives as an example of such an

claim, although that claim requires some discussion.

We have addressed the issue of merging robbery and assault in at least three prior cases. In *O'Hara v. Commonwealth*, 781 S.W.2d 514 (Ky.1989), there was evidence that the two defendants, at least one of whom was armed with a pistol, forced their way into the home of an elderly couple, and in the course of stealing $8,000 from the home used the pistol to beat the man about the head and face. Both defendants were convicted of burglary, first-degree' robbery, and first-degree assault. As in this case, the first-degree robbery jury instruction combined two theories of aggravation, allowing the jury to convict of the aggravated offense if it believed that in the course of using physical force to advance a theft the defendants either injured a nonparticipant in the crime or used or threatened the use of a dangerous instrument—the pistol. The Court acknowledged that theoretically first-degree robbery and assault might be deemed different offenses under *Blockburger* if the allegation had been that the robbery was aggravated not by the injury to the nonparticipant but by the defendants having been armed with a deadly weapon. Because in fact, however, the indictment and the jury instructions had premised first-degree robbery on the same physical injury and use of a dangerous instrument that were the basis of the

assault, the Court held that under *Blockburger* the two offenses merged.

The theoretical scenario noted in *O'Hara* became concrete in *Taylor v. Commonwealth*, 995 S.W.2d 355 (Ky.1999). In that case there was evidence that by threatening the use of a .22 rifle the defendant stole the victim's pickup truck and that in the course of the theft the defendant injured the victim by striking him in the head with the butt of the gun. The defendant was convicted of both first-degree robbery and second-degree assault. The Court held, unlike in *O'Hara*, that those offenses did not merge under *Blockburger*. They did not merge because the jury had been asked to find an aggravated robbery not on the basis of the victim's injury, as in *O'Hara*, but only on the theory that the defendant had been armed with a deadly weapon. First-degree robbery thus depended on proof of the deadly weapon, which assault did not, and assault depended on proof of an injury, which first-degree robbery did not, and so under *Blockburger* the offenses remained distinct and both convictions could stand.

We reached a similar conclusion in *Fields v. Commonwealth*, 219 S.W.3d 742 (Ky.2007). The evidence presented in *Fields* showed that in the course of attempting forcibly to steal a man's wallet, one of the two defendants beat the man

offense the nonsupport of a dependent. *See* Kentucky Penal Code, Final Draft, p. 66 (Nov. 1971). *See also, Britt v. State*, 261 Ark. 488, 549 S.W.2d 84 (1977) (holding under a statute similar to ours that robbery is not a continuing course of conduct offense, and distinguishing, for example, engaging in business without a license or maintaining a nuisance); *Welborn v. Commonwealth*, 157 S.W.3d 608 (Ky.2005) (explaining that assault is not a KRS 505.020(1)(c) continuing course of conduct offense); *Wright v. Superior Court*, 15 Cal.4th 521, 63 Cal.Rptr.2d 322, 936 P.2d 101 (1997) (addressing as a continuing course of

conduct offense failure to register as a sex offender); *Blockburger*, 284 U.S. at 302, 52 S.Ct. 180 (discussing *In re Snow*, 120 U.S. 274, 7 S.Ct. 556, 30 L.Ed. 658 (1887), which involved the offense of cohabiting with more than one woman, and contrasting offenses "having duration" and not "consisting of an isolated act" with statutes "aimed at an offense that can be committed *uno actu* [in a single act]"). Robbery and assault are not continuing course of conduct offenses, and in any event McNeil was not charged with multiple violations of either statute, a prerequisite to the application of KRS 505.020(1)(c).

with a lug wrench and injured him thereby. The other defendant was convicted of complicity to commit second-degree assault and complicity to commit first-degree robbery. Although the Court did not expressly distinguish *O'Hara*, it relied on *Taylor* to hold that the assault and the robbery did not merge. It appears that the only theory of first-degree robbery presented to the jury was that the defendants used or threatened to use a dangerous instrument, and because the robbery conviction was thus not based on the victim's injury, the assault, under *Blockburger*, was deemed distinct.

As McNeil correctly points out, aside from the error discussed above, the first-degree robbery instruction in this case was like the instruction in *O'Hara* in that it allowed the jury to find an aggravated robbery under either of two theories, a theory that McNeil injured a nonparticipant in the crime or a theory that a dangerous instrument was involved. The assault instruction was based on the same alleged injury to Rose and the use of the same alleged dangerous instrument, the car. *O'Hara* suggests, therefore, that McNeil's convictions merge.

Since *O'Hara*, however, we have emphasized our understanding that, if the General Assembly's intent is not otherwise plain, a strict application of *Blockburger* is the appropriate method to resolve KRS 505.020(1)(a) double jeopardy/included offense claims. *Dixon v. Commonwealth*, 263 S.W.3d 583, 588 (Ky.2008) (citing *Commonwealth v. Burge*, 947 S.W.2d at 805 and concluding that a first-degree rape premised on serious physical injury did not merge with first-degree assault). Citing *Dixon*, the Commonwealth suggests that *O'Hara* may not have applied *Blockburger* strictly enough. It argues that first-degree assault is not included within the physical-injury theory of first-degree rob-

bery (KRS 505.020(a)) because the first-degree assault statute requires a finding that the injury was serious, whereas the robbery statute requires only a physical injury, not necessarily a serious one. The Commonwealth is only partially right. While this difference distinguishes the two offenses under *Blockburger*, that distinction alone is insufficient under KRS 505.020(2)(d), which provides that two offenses are the "same" for double jeopardy purposes if their only difference is that one requires a more serious injury than the other. Thus, our analysis cannot stop with the difference in the required injury.

In *Taylor*, we noted the possibility that the physical-injury theory of first-degree robbery could be distinguished for double jeopardy purposes from assault by the requirements that the robber intend to commit theft but not necessarily an injury and the assaulter intend to cause (or wantonly cause) an injury but not necessarily a theft. 995 S.W.2d at 360, n.2. Because *Taylor* involved the armed-with-a-deadly-weapon theory of first-degree robbery and not the physical-injury theory, we did not have to address the possible distinction in that case. The Commonwealth's reliance on the physical-injury theory here, however, and McNeil's invocation of *O'Hara* puts the question squarely before us.

We agree with the hint from Justice Cooper in *Taylor* that even under the physical-injury theory, first-degree robbery does not include all the elements of assault—the intent to injure or the injuring wantonly being an element of assault that is not required for a finding of first-degree robbery even under the physical injury theory. *Cf. Biederman v. Commonwealth*, 434 S.W.3d 40, 43 (Ky.2014) (placement of pipe bomb in car supported both use of a weapon of mass destruction in the second degree and attempted murder charges; weapon of mass destruction does

not require proof of intent to kill or injure, just intentional placement of weapon while attempted murder requires proof of intent to cause death).

Indeed, under the *Blockburger* analysis there are three distinctions in the elements comprising the physical injury form of first-degree robbery vis-à-vis first-degree assault. First-degree robbery involving physical injury requires proof of the following elements: (1) in the course of committing a theft, the perpetrator (2) uses or threatens the immediate use of physical force (3) with intent to accomplish the theft, and (4) causes physical injury to a person not a participant in the crime. First-degree assault requires that the perpetrator (1) intentionally (2) cause serious physical injury to another person (3) by means of a deadly weapon or dangerous instrument, or alternatively that the perpetrator (1) manifesting extreme indifference to the value of human life (2) wantonly (3) engage in conduct which creates a grave risk of death to another (4) thereby causing serious physical injury to another person. As just noted, the mental element for the two crimes is different because first-degree robbery requires an intent to deprive someone of his or her property but no intent to injure while first-degree assault requires an intent to injure or wanton conduct presenting a grave risk of death coupled with extreme indifference to

human life but no intent to steal. Second, as already noted, first-degree robbery requires merely "physical injury" while first-degree assault requires proof of "serious physical injury." [5] Third, the physical-injury form of first-degree robbery does not require proof as to the cause of the physical injury, while first-degree assault requires evidence of the use of either a deadly weapon or dangerous instrument. *Cf. Dixon,* 263 S.W.3d at 590 ("first-degree assault requires a jury to find that the serious physical injury was obtained by use of a deadly weapon or dangerous instrument, but first-degree rape involving serious physical injury to the victim contains no such deadly weapon or dangerous instrument requirement.") [6]

Thus, under *Blockburger,* the physical-injury theory of robbery does not subsume assault for double jeopardy purposes. To the extent that *O'Hara* held otherwise it is hereby overruled. *Cf. Commonwealth v. McCombs,* 304 S.W.3d 676 (Ky.2009) (applying *Blockburger* strictly and thereby distinguishing fourth-degree assault from the physical-injury theory of first-degree burglary, contrary to *Butts v. Commonwealth,* 953 S.W.2d 943 (Ky.1997), which, relying on *O'Hara,* had held that those offenses merged). [7] *Taylor* and *Fields* underscore the soundness of this result, since they make plain that merger under *O'Hara* is often more a matter of pleading

**5.** This level-of-physical-injury distinction standing alone, as noted, would not be sufficient pursuant to KRS 505.020(2)(d).

**6.** As for the use of a dangerous instrument form of robbery, it is easily distinguishable from assault based not only on the different mental elements but because that form of first-degree robbery requires no proof of injury while first-degree assault requires proof of serious physical injury.

**7.** In *McCombs,* a unanimous decision, we stated:

Upon careful reconsideration, we believe *Butts* was incorrectly decided. The physical injury element of fourth-degree assault and the physical injury element of first-degree burglary are not one and the same. The assault statute requires a finding that the injury was inflicted with an intentional, wanton, or reckless mental state. The burglary statute requires no such finding; it merely states that the offender "causes physical injury" to a non-participant. Under the burglary statute, the injury could be accidental.

304 S.W.3d at 679.

than substance, but a double jeopardy issue should not hinge on how the Commonwealth pleads and presents its case, *i.e.*, as a deadly weapon or dangerous instrument form of robbery as opposed to a physical-injury form of robbery.

Against this result McNeil refers us to *Lloyd v. Commonwealth, supra*, in which we held that theft by unlawful taking merges with robbery notwithstanding the fact that one of the elements of theft by unlawful taking—the amount stolen—is not an element of robbery, and thus that, strictly speaking, the offenses are not the same under *Blockburger.* 324 S.W.3d at 387–89. We explained that the terms of the robbery statute, the commentary to the robbery and theft statutes, and a long line of precedent recognizing the merger of theft by unlawful taking into robbery made the General Assembly's intent clear without resort to the *Blockburger* test. *Id.* at 389–91. As noted at the outset, the legislative intent is paramount because the double jeopardy clause "does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." *Missouri v. Hunter,* 459 U.S. at 366, 103 S.Ct. 673.

McNeil contends that the General Assembly similarly intends for assault to merge into robbery, at least under the facts of this case, but as evidence of that intent he cites only a remark from *Roark v. Commonwealth,* 90 S.W.3d 24, 38 (Ky. 2002): "Robbery combines the offenses of theft or attempted theft and assault." The point in *Roark* is that "theft and attempted theft are lesser included offenses of robbery." *Id. Roark* does not suggest that assault is a lesser included offense of robbery, even of first-degree robbery under the personal-injury theory, and McNeil has not cited statute, commentary, or prece-

dent (other than *O'Hara*) that indicates otherwise. The *Blockburger* test is thus the appropriate avenue for determining whether McNeil's assault conviction merges with his robbery conviction, and as noted above under that test—*O'Hara* notwithstanding—the two convictions do not merge.

McNeil also devotes several paragraphs of the "legislative intent" portion of his brief on this issue to an argument that because robbery involves a "course of conduct," KRS 505.020(1)(c) precludes parsing that course of conduct into more than one crime. As noted above, however, that argument fundamentally misapprehends KRS 505.020(1)(c), which concerns multiple charges of a particular kind of offense, specifically a continuing offense such as nonsupport. *See Hennemeyer v. Commonwealth,* 580 S.W.2d 211 (Ky.1979) (upholding multiple charges of wanton endangerment). That subsection does not create any sort of exception to the *Blockburger* test under KRS 505.020(1)(a), and is not applicable to the charges lodged against McNeil.

## IV. A Minor Instance of Hearsay Did Not Sway the Jury.

██ Finally, McNeil contends that the trial court erred to his substantial prejudice when it permitted the Commonwealth, during the testimony of its lead investigator, to show the jury a copy of the Cricket phone company record identifying McNeil as the customer associated with "B's" phone number. Although we agree with McNeil that publishing this record to the jury may have violated the rule against hearsay, we are convinced that any such violation was harmless and is not a ground for relief.[8]

McNeil asserts that hearsay use of the phone company record violated his rights under the

---

**8.** *Citing Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004),

The issue arose prior to trial when McNeil objected to the Commonwealth's proposed introduction of the record. Because no one from the phone company was present to authenticate the record, the trial court would not allow the Commonwealth to introduce it into evidence, but over McNeil's objection the court did allow the Commonwealth to use the record as a demonstrative aid as part of the lead investigator's explanation of how McNeil had become a suspect. The investigator testified that officers had taken "B's" number from Rose's cell phone, used the internet to learn that the number was a Cricket number, and then obtained from a local Cricket outlet the company record which associated McNeil with that phone number. The officers had then prepared the photo pack from which Wheeler and Rose picked out McNeil's photo as depicting the person who had stolen Wheeler's purse and driven over Rose. In response to McNeil's objection, the Commonwealth argued, and the trial court agreed, that as part of the investigator's explanation of why he had put together the photo pack, the phone company record was not being used for the truth of its contents and so did not implicate the rule against hearsay.

■ Kentucky Rule of Evidence (KRE) 801 defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." A trial court's evidentiary ruling with respect to alleged hearsay will be upheld unless it amounts to an abuse of discretion. *Jones v. Commonwealth,* 366 S.W.3d 376 (Ky.2011).

McNeil acknowledges that a police officer has some leeway to testify about information furnished to him, but he contends that the leeway is limited to information that minimizes hearsay and that tends to explain why the officer took the action he or she did, but only if the taking of that action is an issue in the case. *Chestnut v. Commonwealth,* 250 S.W.3d 288 (Ky.2008); *Gordon v. Commonwealth,* 916 S.W.2d 176 (Ky.1995). Even limited to a demonstrative aid, use of the phone company record here, McNeil complains, was improper both because it had a substantive hearsay purpose—it tended to identify McNeil as the perpetrator of the crime—and because its non-hearsay purpose was irrelevant—the officers' conduct was not at issue.

McNeil's point is well-taken. Certainly the phone company record was not necessary to refute some claim by McNeil of police impropriety because there was no such claim. *See Brewer v. Commonwealth,* 206 S.W.3d 343, 352 (Ky.2006) (holding that admission of hearsay statements by officers was error because the officers' actions were never at issue. "No question was ever raised as to the propriety of the steps taken by the police."); *cf. Chestnut,* 250 S.W.3d at 294 ("Appellant accused Officer Ebersol of lying during his testimony. Therefore, why the police arrested Appellant was clearly at issue."). Given the hotel security videos, moreover, and their stark depiction of the attack upon Rose, the only question genuinely remaining about the crime was the identity

Sixth Amendment's Confrontation Clause. The *Crawford* rule, however, applies only to testimonial hearsay, which the phone company record at issue here clearly was not. *Bullcoming v. New Mexico,* —— U.S. ——, 131 S.Ct. 2705, 2714, n.6, 180 L.Ed.2d 610 (2011) (*citing Davis v. Washington,* 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006) and Me-

lendez–Diaz v. Massachusetts, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009), and noting that business records, generally not created for the purpose of establishing or proving some fact at trial, are generally not testimonial.). We address McNeil's claim, therefore, simply under the Kentucky Rules of Evidence.

of the perpetrator, and, as McNeil insists, the phone company record associating him with the phone number that appeared on Rose's phone as "B's" number had some hearsay tendency to point the finger at him.

Even if the trial court abused its discretion, however, by permitting the Commonwealth to put the phone company record in front of the jury as a demonstrative aid during the testimony of its investigator, rather than as an exhibit through a company representative's testimony under KRE 803(6) or through the self-authenticating provisions of KRE 902(11), the error was clearly harmless. The officer could legitimately have achieved much the same effect by excising the hearsay and simply telling the jury that after investigating the number left on Rose's phone he developed McNeil as a suspect and decided to present Wheeler and Rose with the McNeil photo pack. More importantly, any illegitimate prejudice resulting from McNeil's being identified in the phone company record, was miniscule compared with the legitimate prejudice resulting from the identifications of him that Wheeler and Rose provided both during their photo-pack interviews and during their testimonies at trial. These identifications were not of a stranger but of an acquaintance with whom both women had spent some time prior to the night at the hotel. We are assured that the judgment was not substantially swayed by what may have been the improper use of the phone company record. The error, therefore, if any, was harmless and does not entitle McNeil to relief. *Winstead v. Commonwealth,* 283 S.W.3d 678, 689 (Ky.2009) (explaining that an evidentiary error is harmless if the reviewing court "can say with fair assurance that the judgment was not substantially swayed by the error.").

## CONCLUSION

In sum, McNeil was fairly tried and lawfully convicted of both robbery and assault. Although the jury instructions had minor flaws and although the Commonwealth's investigator should not have been allowed to refer to an unauthenticated phone company record, those errors do not entitle McNeil to relief. McNeil was not, moreover, punished twice for the same offense. First-degree robbery, even a robbery aggravated by the robber's having injured a non-participant in the crime, is not the same offense as first-degree assault. Under the *Blockburger* test the two offenses require two different mental states—an intent to steal on the one hand, and an intent to injure or wanton injury on the other and two different levels of injury—serious physical injury for first-degree assault but simply physical injury for first-degree robbery. Moreover, the physical injury form of robbery does not require proof that the perpetrator used a deadly weapon or dangerous instrument, but first-degree assault does. The offenses not being the "same" for double jeopardy purposes, McNeil is lawfully subject to punishment for both. Accordingly, we hereby affirm the Judgment of the Jefferson Circuit Court.

All sitting. All concur.